I have the lawyers mixed up here. I just need to know who's who for the last case for Gaines. Our last case this morning is case number 16-15583, Linda Gaines v. E. Casey Wardynski. Mr. Brooks. May it please the court, my name is Taylor Brooks and I represent the appellant in this case, former superintendent of Huntsville City Schools, Casey Wardynski. Today I'm going to ask the court to reverse the decision of the district court and dismiss all claims against Dr. Wardynski. Now this is a qualified immunity appeal where Dr. Wardynski asked qualified immunity in a motion for summary judgment and that was denied by the trial court. The district court erred for several reasons. First, the district court erred in determining that even when considering all the facts in the best light to the plaintiff that there was a constitutional violation. Because the facts even considered in the best light to Ms. Gaines did not demonstrate that Dr. Wardynski acted with any impermissible motive with respect to any— You're saying this is the causation element or— Yes, Your Honor. Well, but your brief I think sort of puts together a lot of different strands of argument. I mean it's one thing to say there's no constitutional violation here because there's no causation and because there was no retaliation. But it's another thing to say that as a matter of just abstract law, there's no constitutional right involved at all if there's a firing along the lines of what Ms. Gaines alleged. Correct. And I thought you argued all of those things. You're right. I just hadn't finished. Okay. Yes, Your Honor. And also we argue that Dr. Wardynski did not violate any clearly established law even if the facts as alleged by—even if there were a constitutional violation, we think the district court erred in finding that there was a violation of clearly established law. Well, as to the first part, which leave out the word constitutional, this is just the merits. And I will say the facts are all over the place about what job she sought. What in a nutshell is your position? Assuming that there's a constitutional claim here, what is your position as to why the evidence does not demonstrate that she was retaliated against, focusing on whatever particular job she wanted, which is hard to sort of identify on the record? Well, in a nutshell, it's because the decisions were made by people other than Dr. Wardynski without any input or any knowledge from Dr. Wardynski. And let me take—there are three positions, three assignments that are at issue at this case. Two of them I think are—I can discuss together and then one of them I'd have to discuss separately. Okay. Two of the assignments are that—are ARI coach, ARI literacy coach and curriculum specialist. That would be the literacy coach at Davis where she was presently employed. Right. Well, when you apply for a literacy coach, you apply with the central office and you can be assigned to any school. Anywhere. Anywhere. Okay. That's right. All right. Anywhere. So, you apply— The second position would be? Curriculum specialist. Is that for anywhere? You can be assigned anywhere. The process— And the third would be—let's get it on. I'm sorry. It would be the TOSA, which stands for teacher on special assignment. Okay. All right. Now, in the process for TOSA is different than the other two—than the first two. The process for the literacy coach and the curriculum specialist is you apply in the central office. Because we're talking a school with 1,400 teachers. There's a— She applied, correct? Not for curriculum specialist. No, but literacy coach. Literacy coach. She applied. Literacy coach. Right. And so there's—and so she was screened by the talent management department that was headed by Debbie Meiser. That department had no communication with Dr. Wardynski about anything related to— I think—I don't think there's any contrary testimony. Had no communications with Dr. Wardynski about Ms. Gaines' application. They decided—the talent management department decided that she didn't have— This is the job where they put a sticky note. They asked her to call them back so they could talk to her about training, but she never called them back. Yes, Your Honor, that's correct. Is that undisputed in the record? Does she disagree and say, oh, yes, I did call them back? I'm not aware that she—I don't believe she testified that she called them back. So your argument on that one is sort of an incomplete application, I guess. Well, that and however it was decided, Dr. Wardynski wasn't involved in that decision. He only took—once the talent management—so the talent management screened applicants for curriculum specialist and for literacy coach. Then the talent management would then take four people and they would give four applicants to each principal who had that position. And the principal would then choose among the four people that were given to that principal by talent management. The principal didn't have carte blanche to hire whoever they wanted. All right. And this goes back to reasons for— And her name does not go to her principal at Davis because she—they viewed her as not having complete—didn't respond to the call, didn't indicate what her training was. For curriculum specialist because she didn't apply. All right. So tell us, curriculum specialist, you applied district-wide for that? Yes, you apply. She never applied? Didn't apply for curriculum specialist. And for reading coach, of course, Davis Hills didn't get a reading coach that year. So her name still could have gone for consideration, but it just wouldn't have been Davis Hills. Now, what is a reading coach? Is a reading coach a literacy coach? Did I say reading coach? Yes. I apologize. They call it reading and literacy depending on whether it's elementary or high school. So you're back to literacy. But okay, so she didn't apply for that. It's the same thing. Okay. So you're saying on the first one, incomplete application, just didn't get back to him. Second one, didn't even apply. Third one, TOSA. Tell us about that. Now, TOSA is a little bit different because while you're still screened by the Talent Management Department, it isn't an assignment that you apply for. The normal process is that a principal will recommend you for that assignment. But it has also been the case. But if the principal doesn't recommend you, what do you do? Well, you could still be considered if an administrator, sometimes, for example, a director of instruction or a deputy superintendent, or in rare cases, a superintendent, can ask the Talent Management Department to put that person through the screen even if they're not recommended by a principal. So what happens? And none of that happened here. Nobody recommended. And plaintiffs may want to talk about that. But nobody recommended. So how would you apply? Don't you still just say, I'd like to be considered for this in any place where there might be a position? The way it was set up, you don't apply for that position. Somebody recommends you. Somebody recommends you. There's no application process for that. Mr. Brooks, I want to ask you about the law. Judge Callen relied on two Eleventh Circuit cases, Bryson v. City of Waycross and Hatcher v. Board of Public Education. For his holding, the qualified immunity does not apply. Why don't those cases control this case? Okay. Well, the Bryson case, he specifically said, of course, this is a case where the plaintiff is alleging that she was retaliated against based on statements that were made not by her but by her father. And that makes it an unusual case. And so the district court said that it's clearly established that you can have a retaliation claim, a First Amendment retaliation claim, freedom of speech retaliation claim, based on the statements of a relative or your father. The Bryson case doesn't say that. And so I think the Bryson case was miscited. Why? Bryson doesn't say that. Why? Is it because it's Title VII? It's a First Amendment case. Because the facts of that case didn't involve the speech of a relative. It involved the speech of the employee. But there are a lot of cases that are certainly out there on attribution to other family members and others, right? How do you distinguish those? I'm not aware of the cases you're discussing. I know that there was a case, Lewis versus the Lewis case from the Middle District, which discussed a similar case where an adverse employment action was taken against an education employee based on the statement of her father. And the question in that case was, was it clearly established that a superintendent or a decider could, it was against the freedom of speech under the First Amendment, whether it's clearly established that that is a violation. There wasn't any cases on point on that. They basically said, well, there's some cases in other circuits, and we think it's obvious. Is this an obvious clarity situation, isn't it? I don't believe it is. I believe, I would kind of liken it to the Lane v. Franks case where you had an education employee who was terminated because he testified. Let me read you this from the Priester case, 11th Circuit. This inquiry is another kind of obvious clarity assessment, see that it's applicable when the official's conduct lies so obviously at the very core of what the First Amendment prohibits, that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law. And I think the obvious, I think that's been called a narrow exception by the 11th Circuit. I believe most recently in the Dukes v. Deaton case, there is an obvious exception. I think that's a very narrow exception that's come in the context of Fourth Amendment cases where they're discussing whether unreasonable force was used. Excuse me one second. Tony, can you please give each of them five additional minutes?  Go ahead, I'm sorry. And I don't believe that this fits in the narrow exception to obvious. I don't think it's obvious that you can't retaliate based on the statements of a relative, just like it wasn't obvious in Lane v. Franks that, I mean, that you couldn't retaliate based on that person's truthful testimony in a court proceeding. I mean, do you think there's, to follow up on Judge Vinson's line of questioning, do you think there's any clarity on retaliation in the freedom of association sphere? In other words, people, right now, public officials can just, there's no clearly established law that officials can't retaliate based on people's freedom of association? No. Do you think there's no core that's apparent, readily apparent? I believe there is a core that's readily apparent, Your Honor. What's that core? I think for freedom of, starting for freedom of speech. No, let's talk about this case, freedom of association. Okay. What's the core that everybody knows you can't do? You can't, that you can't unduly intrude on, burden the, well, on an intimate association case, that you can't unduly burden the intimate, act in a manner which would unduly intrude into the intimate association of, that the plaintiff has with the other person who's claimed. Well, you don't think this is it? No. Assuming proof of causation existed, so putting aside Judge Carnes' questions about the record, we're talking abstract, you don't think that it's obvious to a government official that he or she can't discriminate against an employee based on what a family member does or says? I think it's obvious that he can't do it in a manner which intrudes on the relationship, family relationship. Let me flip the facts on you a little bit and give you a hypothetical that is not this case. So let's assume that a public official has a subordinate who is applying for a certain position, right? And that person is about to be married to another person. And the official says, you know, I don't really want you marrying that person. I've known his or her family. They're just not good stock, not good people. They're troublemakers. I'd rather you not do that. And the subordinate says, no, no, I'm going to go ahead with the marriage. I love him or her, and we're going forward. And the supervisor says, well, you know, if you do that against my wishes, then that promotion isn't going to happen for you, and you're going to run into a dead end here at this place. There's not going to be any future for you. The person goes ahead and gets married, and it turns out that there is a dead end and that there is no promotion and that life becomes really difficult at the workplace. Is that a situation of obvious clarity? Yes, but it's different than this situation. I know. That's why I said it's hypothetical. It's different. I completely acknowledge that it is. But I'm trying to get you to tell me where that core of obviousness is. So you think in that hypothetical, which is admittedly different, there would be a clearly established freedom of association right that couldn't be violated? Right, because the job was conditioned on whether or not – it intrudes on the relationship because your job is conditioned on whether or not you can enter into that relationship. That answers this case, at least on the abstract question, because if that is clearly established because it's an intrusion, how could this not be an intrusion? We're, again, putting aside the factual record because you've got two or three arguments on that, but we're talking about the clearly established question. If you deny somebody a position or a promotion because of what a father or a mother or a brother or a sister or a spouse says, how can that not intrude on that relationship? Aren't you at that point discouraging an association between the daughter and son and father or mother? Like stay away, disassociate yourself from what your family members are saying or else you're going to have trouble here? I don't think there's any evidence of that in this case. I know. I'm putting aside all the evidentiary issues and your arguments about the lack of causation. This is the abstract question about whether or not there is a right and whether or not any such right is clearly established. I would argue, Your Honor, that there would have to be some further, not just that there was an adverse employment action, but that somehow the relationship was intruded upon other than just the fact that there was an adverse action. I think that's supported by the Singleton case, which we cited, albeit from another circuit. All right. Thank you very much. We'll give you your full time for rebuttal. Mr. Lockwood. May it please the Court. I'm Robert Lockwood. I represent Linda Gaines in this case. There are really two pure legal issues. Before we get to your argument, Mr. Lockwood, you gave us a stack of, I believe, supplemental authority this morning. I count over ten cases. I speak only for myself, but that's not a very good thing to do. Yes, Your Honor. If you have supplemental authority, you know, give it to us at least a couple of days before so that we can look at it, so that your opponent can look at it, and so that we can talk about the issues. But handing out a number of cases minutes before argument is supposed to begin isn't really helpful to anybody. So have you given copies of those cases to your opponent? I've read the rules before coming today, Your Honor, and I apologize for not. I probably should have called the clerk's office for clarity, and I did not. The short answer is I brought enough copies for everybody, including opposing counsel today. Have you given them to him? I gave all my copies to the clerk's office this morning, including my own copies, Your Honor. Where are the copies for Mr. Brooks? You've got the other copy? Okay. Not that it's going to do him any good at this point. Well, you're not planning to argue these cases that nobody's heard of until today, or are you? I certainly was planning on making reference to them, Your Honor, yes. Well, you know, that puts everybody in a very difficult bind because we've read the briefs. We've read the district court's order. We've read parts of the record, not the whole record. And now, I mean, I skimmed, and they told you in law school this was a very dangerous thing to ever do, but I've skimmed the head notes just to get an idea of what the case is about, but that's not a good situation. So, on the other hand, we can't act as if we're going to stick our heads in the sand and ignore them. So, what I'm going to do is give you a chance, and we're not going to discuss these cases today because that would not be fair to Mr. Brooks, but what we are going to do is give you a chance to file within a week of today a five-page letter brief. Addressing those authorities. And, Mr. Brooks, you've got an additional week after that to file a responsive letter brief, also limited to five pages, with regard to those authorities as well. Okay? With that, go right ahead. Thank you, Your Honor. So, there are two legal issues. Since facts are always important to me, and we've got a lot of tough legal issues, but we don't even have to get to them if it turns out that a basic employment case, your client didn't apply for the job, and we can't say that the superintendent had anything to do about her not getting a particular job. So, could you take it one by one? We've given you more time. What exactly, what adverse action is it? What job are you saying she did not get a promotion to, and what is the connection of the superintendent? I guess starting, are you saying that your cause of action is based on the literacy coach position? Your Honor, I think the primary position in this case, clearly the position that Ms. Gaines would have preferred and that she was clearly in line for, was the TOSA position. Well, let's make sure what you're not worried. You're not pursuing the literacy coach then? No, Your Honor. Certainly, we are pursuing literacy coach. Okay, but she didn't complete her application. She didn't have the training, and they have us sticking out, and they call us back, tell us about this, and she let it lapse. So, isn't that pretty much, that one's not going to be in play anymore? No, Your Honor. Respectfully, the facts show two things with regard to causation on the literacy coach position. She did apply. That is unquestioned. She did apply. There are issues of fact with regard to this ARI training requirement. It's not in any job description. Leave that aside. They said call us back about your application. She didn't call them back. When I apply for a job and they ask me to call back and I don't, I'm the employer. I think they're not interested in the job. I think there's issues of fact as to whether she got the phone call in the first place, Your Honor. What's the testimony indicating? She didn't get the call. I don't know that there is one way or the other that she got the call, Your Honor. It says they left a message. Well, you know the record. I mean, did she testify and say, I never got a call? Honestly, Your Honor, I don't remember that issue on the record as we sit here right now. All right. But nevertheless, the superintendent's trying to divorce himself from the position of ARI coach, which was a position that had been discussed with Ms. Gaines by her principal, Jill Burwell, as an effort. Is that the literacy coach? The literacy is the same as ARI coach. All right. Let's call it literacy. Yes, Your Honor. Literacy coach. Her principal, Jill Burwell, had said, I have positions coming up for literacy coach and curriculum specialist, one of the two. If you'll stay at Davis Hills, I want you to be that. And Ms. Gaines says, Well, I'm talking about TOSA with the superintendent, but I'll let you know. The superintendent then does not offer Ms. Gaines a TOSA position, and so she sends an email to the superintendent that says, Respectfully, Mr. Superintendent, my principal offered me a literacy coach position. I'd like to take that position. The superintendent then sends an email to the deputy superintendent that says, Are we making her, I'm sorry, an ARI coach? And then at some point, there's issues as to whether it was before or after that email, the director of secondary education then calls the principal and says to Jill Burwell, the principal, Don't talk to Linda Gaines about any positions anymore. You're saying that even whenever this application came through and she didn't respond, essentially she'd applied for the job by going over the head of the process to the superintendent? That's right. And the superintendent became directly involved in the process to ensure that she would not get the job. Well, he partly got involved because her father asked him about his daughter getting a job, right? Well, certainly he did ask him that question. Right. So we'll leave aside curriculum. I don't think you're going on that one. TOSA, you want to tell us about TOSA? TOSA was a position that was talked about with Ms. Gaines a year before about potential administrative positions. And the superintendent asked Ms. Gaines a year before, Please remain at Davis Hills for a year. And then the impression that Ms. Gaines got was they would talk again in a year. And certainly the email, the superintendent sent an email saying, I promise to get back with her at the end of the year to talk about future positions. And the superintendent then directs his number two, the assistant superintendent, and he directs the director of secondary education, the person who's in charge of high schools, sit down and talk to Linda Gaines. And they do that, I believe it was on April 8, 2013. And during that meeting, the director of secondary education, Edith Pickens, talks to Ms. Gaines and says, You know, you're doing a good job. I want you to accept summer committee positions. We have a tape that says where Ms. Pickens says, When I'm in your classroom, I don't want to leave. I love what you're doing. After that meeting, the number two, Dr. Cooper sends an email to Dr. Wardynski that says, We had a great meeting with Linda Gaines today. Edith Pickens and I both agree that she would make a great candidate for TOSA. What do you think, Dr. Wardynski? And Dr. Wardynski responds, I think she'd make a great candidate. I'd like to see her in that position. I think she has a good head and a good heart. But let's let her talk to Jill Burwell first. And so then, that's April 8, May 1, Commissioner Harrison speaks out and criticizes the superintendent and the board for failing to remedy the vestiges of segregation. I'd like to ask you, Mr. Brooks, on the law of this case. Set aside the facts for a minute. You're relying almost entirely on Thompson v. North American in your speech claim. But that's a Title VII case. Give me one citation to any Supreme Court decision or Eleventh Circuit decision or Supreme Court of Alabama decision that says the free speech is applicable in this kind of a situation to a relative's exercise. You cite the Middle District of Alabama District Court decision, the Lewis v. Eufaula City, but that's hardly in that category. I have two replies to that, Your Honor. Certainly one case that we have cited in our brief from the Eleventh Circuit is Carr v. Cadot, which arose, the facts in that, arose in October of 2013, which obviously is after May of 2013. But in that case, a husband and wife are walking down the street, and the wife unquestionably curses at a police officer who then engages in a retaliatory arrest of both the wife and her husband. And the Eleventh Circuit didn't throw out the husband's claim on the ground that he didn't possess any such claim under the First Amendment free speech provision. Instead, it found that both the wife and the husband possessed clearly established free speech rights. Is that a published decision? It is not a published decision, Your Honor. It's only persuasive authority in this case. And I will say, Judge Jordan, that I do have additional authority that we'll cite in our letter brief. Well, I've looked at the Metz case, which is one of your late filed cases, and it also is unpublished, and of course, it's far after the time we're talking about, three years later. And it cites Thompson in passing, but it doesn't specifically argue one way or the other that First Amendment claims under the Constitution are encompassed within the Thompson's decision on a statutory right under Title VII. It's a pretty weak connection. Well, the way I read the case, Lloyd, Your Honor, is, first of all, that Metz and Cadeau recognize the existence of the right within the First Amendment. Then the second question is, was it— Tell me, what is your best case? I mean, what is the one or two cases that you would say, you look— a layman looks at it, a lawyer looks at it, I know the answer. What would those one or two cases be? Well, clearly, our best case, Your Honor, is not freedom— are you talking about freedom of speech or freedom of association? I'm talking about whatever you've got to make your case that this law is clearly established. Freedom of association, Your Honor. No, your best case. What is your best case, legal case, that would put somebody on notice? For whatever theory you want, what is that case? The best—certainly, the best published case, Your Honor, is Wilson v. Taylor from the Eleventh Circuit. Wilson v. Taylor? That's not an association case, though. What is it? Thumbnail sketch. I sincerely apologize. These are cases that I've put in front of you today, Your Honor. You've been asked a question. You can ask about it, and if you're not ready to respond in your rebuttal, you'll have a chance in your letter brief. But standing right here, you don't have, other than a case you just handed us, you can't come up with a good case that would show this is obviously clear. Well, obvious clarity is different from material similarity in the analysis, Your Honor. Those are two different— I'm just saying whatever you want to call it. What is the best case we've got to say, yes, this case, if it had been read by the superintendent, would have put him on notice? That case, is there one other than Wilson, which you just handed us? And, again, Wilson v. Curry, which I've just handed you, Your Honor, are both association cases. Well, you cite the Second Circuit case of Adler, but, again, that's not an Eleventh Circuit case or a Supreme Court decision, so it really wouldn't qualify for qualified immunity. And even if you're talking about the obvious, the Second Circuit said its point is debatable. So that makes it sort of questionable whether that would be found to be true by other circuits anyway, doesn't it? Well, Your Honor, again, I think with regard to all the way from the Supreme Court as cited in McCabe v. Sheriff, anything that resembles a family relationship is protected. Well, that's—we all know from our qualified immunity law, that's so general. So, yeah, it's protected, but then you have to dig down to particular facts. What does that mean, protected in what way? So we need a little—a case with a little more specificity. Well, sure. So, Your Honor, you've got Wilson v. Taylor, which the court said— You can't talk about because you just handed it. There certainly are no cases that we've cited dealing with the protection of a child from retaliation based upon the conduct of a parent. Nevertheless, given the fact that it is clearly established, even on a general level, Your Honor, that family relationships are protected and cannot be retaliated against from that. The only issue after that is whether or not government has a legitimate reason. Well, are you saying that in a situation that an employee's father could just go out and say any sort of thing he wants? And I'm sure the father in this situation is a respectable man and would not do this. That's not my example, but let's say another father would just be angry at his child's boss and engage in all sorts of ad hominem attacks and call the principal or superintendent names, really ugly things on the Internet as these things get going. And superintendent can't have this kind of thing where this kind of thing is going on. Certainly, if the employee had said that she could be fired, there's no protected conduct there. Are you saying when that kind of attack by a family member comes along, that this broad associational right means that the principal has to put up with that and can take no action against the employee? I think the case law is pretty clear, Your Honor, that unless there is a legitimate reason to condition employment. Or just comment on First Amendment retaliation. It's a question you don't know the answer to right at the top of your head, right? No, Your Honor, I disagree with you on that. I say that unless, the case law is, unless there's a legitimate reason to condition employment on the speech or association, then retaliation of any kind is prohibited, Your Honor. That is definitely the point. Go ahead and finish that, and then I'll ask you. I mean, that is exactly what happened in McCabe v. Sherratt, in Shahar v. Bowers. That wasn't McCabe v. Sherratt. That wasn't McCabe v. Sherratt. That was just the wife. She just married a judge. That's right. That the loyalty that a wife would show to the husband. I'm talking about a parent who is causing problems in the operation of the school because this guy, and it's hypothetical, a nutty father. Not the father in this case. He's a respected man. A nutty father who's just going after tooth and tongue and creating an uproar in the school. If the employee were acting that way, she should be fired. Why would she be insulated because her father is doing it? No, I agree with you totally. Under the First Amendment. I agree with you totally on your fundamental premise. That if it is interfering, if the speech or the association is interfering with the operation of the school system, then yes. Then employment can be conditioned on that. But that's not this case. That's not. But the whole point is, when you're talking about clear notice, is this is a difficult area. It's a broad area. And superintendents sitting there can't make the kind of line drawing we are. Just to have a general right doesn't tell you whether that right can be vindicated on the facts of a particular case. Absent case law telling us that. I would disagree, Your Honor. I would say the case law demonstrates that if there is a legitimate school-related operational reason for making employment a condition, then yes. But if there is any legitimate reason that's missing, then there is fair notice to every reasonable government official that you can't take arbitrary action like this. So respectfully, Your Honor, I would disagree with you on that. Mr. Lockwood, I do want to ask you about the standing issue before you lose your time here. Because I think standing is a major issue under the prudential considerations that the Eleventh Circuit has said control the right of litigants to bring actions on behalf of third parties. And those three are, and this is an en banc decision from the Harris case, three important criteria satisfied or have to be satisfied. First, the litigant must have suffered an injury of fact, which you may have, giving him or her a sufficiently concrete interest in the outcome of the issue. Second, the litigant must have a close relation to the third party, which you've got. But here's the third one, and this is the thing I want to ask you about. And there must exist some hindrance to the third party's ability to protect his or her own interests. What is the hindrance to the father in this case to bringing his First Amendment claim? Your Honor, I can address that issue come letter brief time. It's part of the authority that I put in front of you. There's certainly no— His standing has been pretty clearly raised in the briefs here. I mean, it's an open issue and very clearly is relied upon by the appellant. Sure, Your Honor. So the hindrance on his rights is that the retaliation against his daughter— And let me just remind you that this circuit in the Bennett case has said that public—I mean, private citizens can sue governmental entities for violations of the First Amendment if they have objectively suffered an adverse action. So they've got—his father's got a First Amendment right, it appears. Well, respectfully, Your Honor, I don't know that Bob Harrison has suffered an adverse action. I mean, he has no damage. All the damage in this case has been directed at his daughter, Ms. Gaines. And respectfully, on the standing issue, I don't believe that Ms. Gaines is asserting third party rights or third party standing. I believe she's asserting her very own rights that have been recognized by— Retaliation for his speech. Exactly. But it's his speech. That's the object of the retaliation, right? It's his speech, but it's her right, Your Honor. Your assertion is that this is not a third party standing case in the traditional Craig versus Boren sense where you are not only asserting your own injury, but you're also trying to wrap into the constitutional right asserted by another party, which gives you a better standard of review and gives you a better chance of succeeding. Whether you win or lose on the association and speech claims, your argument, as I've always understood it in the district court and here, is that Ms. Gaines suffered injury by not getting the position she sought, and that was based on retaliation for her father's speech. That's right, Your Honor. Right? Yes, sir. And if you can prove that she didn't get a position because of her father's speech, then she has shown injury in fact. Yes, sir. Right? The legal question is whether or not that sort of right is clearly established, but your argument is that she has suffered injury in her own right, and she's not asserting her father's injury. She's asserting her own. That's correct. Thank you. All right. Thank you very much. You've got your full time. Thank you, Your Honor. The first thing I'd like to address that Mr. Lockwood raised was on the factual issue about Tosis. Mr. Lockwood's correct that Ms. Gaines did meet with the deputy superintendent and Ms. Pickens, and that the superintendent and Dr. Cooper, the deputy superintendent, did have discussions about possibly putting her through the Tosis screen. But what happened was on April 10th, which was well before the May 1st date of her father's speech that was alleged to have retaliated on, Ms. Pickens told Dr. Wardinsky, the superintendent, that she didn't believe that Ms. Gaines was well-suited to be a Tosa. And there's no, both Dr. Wardinsky and Edith Pickens testified that this conversation occurred. I don't think you can dispute this by just calling them liars. I think there's case law on that that we cited. Does she explain why she was glowing in front of the plaintiff? Is it just when you have somebody, you just, you know, you say nice things when they're in front of you? Why would she say such nice things about the plaintiff when the plaintiff was in the meeting, but then contradict that later? I believe Ms. Pickens' testimony was that she felt like that, you know, that Linda Gaines was all about herself and not about serving the students is what she told Dr. Wardinsky. Well, did she have any explanation? Has anybody asked her why would you be so glowing at the first meeting when Ms. Gaines is there and then do an about-face? I don't recall what her testimony was if she was asked that, and I apologize. Is that a disputed issue of fact then? I don't know because we've got her saying two different things, actually. You know, I think she said something, in fact, that I enjoy being in your classroom. I think that's different from whether she should be promoted to an administrative position. Are you saying that representation or subsequent recommendation or negative recommendation on her part then impacted how things developed after that? Right. Dr. Wardinsky's testimony was, after he heard that from Edith Pickens, that he was going to let the normal process take its place instead of him putting her through the TOSA screen. But I think the important fact is, in this case, is the deadline for TOSAs to be put to Talent Management for Screening was April 19th, and the date of the speech at issue was May 1st. And so Dr. Wardinsky didn't follow through. How could he have been motivated by the speech on May 1st not to give her name to Talent Management by the April 19th deadline? And that's where there's no disputed issue of fact, because it is clear in there that April 19th— And he says, whatever job she wants, which probably is not the appropriate procedure to get jobs, but that's what he said. And then that would have been obviously before the May 1st speech, right? Right. That was her father's testimony, correct. All right. Okay. So they're just—when you look at these decisions, they don't fit with a violation. There's no causal connection. I want to ask you about the retaliation. Who was it against? Was it against the father or the daughter? Well— You don't think there's a— I don't—I allege there wasn't any retaliation. Well, assuming there is some retaliation, who was it against? Well, I guess it would have had to have been against the father because they're not alleging that the daughter did anything which would warrant retaliation. No, but the whole purpose—whether or not the claim survives legally, it's a whole different issue. But the asserted claim is that the retaliation is against her through the denial of a position based on her father's speech. Now— I agree that's a claim. That theory may or may not play out under the First Amendment, and even if it does, it may not be clearly established. But that's the claim that's been pled and argued throughout this case, right? That supposedly the father said X, and adverse action was taken against her because of what her father had said, which was critical of some of the things that Mr. Wodinski was doing with regards to the school system. I agree with what Your Honor just said. That's the pleading in this case. That's the way it was pled and argued, right? Yeah, I agree that that's the way it was pled. Right. Okay, we'll give you a chance to wrap up if you'd like. Okay. I think through the argument here, it's been established that not only was there no constitutional violation, but the law is not clearly established in this area. I would ask that the court reverse the decision of the district court with respect to Casey Wodinski and dismiss in order that the claims against him be dismissed on the basis of qualified immunity. All right, thank you very much. Again, letter briefs starting Mr. Lockwood with you a week from today, and then Mr. Brooks a week from that day. Okay, five pages each. Thank you very much. Thank you.